# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | No. 1:17-cr-00392 |
| v. : | |
| : | (Judge Kane) |
| **MICHAEL E. TORRES,** : | |
| **Defendant** : | |

## MEMORANDUM

Before the Court is Defendant Michael E. Torres ("Defendant")'s motion to suppress evidence pursuant to the Fourth Amendment to the United States Constitution. (Doc. No. 22.) For the reasons explained herein, the Court will deny the motion.

## I. BACKGROUND

### A. Factual Background[1]

On October 31, 2017, minutes before the scheduled 6:00 p.m. start of trick-or-treating for the children of York, Pennsylvania on Halloween evening, Officer Steven Pickel ("Officer Pickel"), a patrol officer employed by the York City Police Department, was on routine patrol in the west end neighborhood of York. (Doc. No. 44 at 4: 1-25, 5: 1-3.) The west end is a high-crime area and, in Officer Pickel's assessment, experiences "a lot of drug incidents, shooting incidents, homicides, aggravated assaults, burglaries, [and] robberies." (Id. at 5: 24-25, 6: 1-2.) As a patrol officer, Officer Pickel regularly "receive[s] reports of shots fired in the west end area" (id. at 6: 7-8), and during the months of October and November, he receives "reports of shots fired . . . multiple days per week" (id. at 6: 19-22). While a nearby neighborhood known as

---

[1] Unless otherwise noted, the facts recited herein are derived from the transcript of the suppression hearing held by the Court on July 19, 2018. (Doc. No. 44.) During the suppression hearing, the Court heard testimony from Officer Pickel ("Officer Pickel"), Officer Jonathan Hatterer ("Officer Hatterer"), and Defendant.

the college area also experiences a high level of crime, that criminal activity consists largely of "burglaries, vehicle thefts, [and other] things of that nature." (Id. at 5: 20-23.)

A few minutes before 6:00 p.m., just as the sun was going down, in a neighborhood of York that "bridges the gap between the college area and the west end" (id. at 7: 10-13), Officer Pickel traveled west on King's Mill Road and "turned north onto South Penn Street" (id. at 7: 20-21). As he turned the corner to proceed north onto South Penn Street, he encountered "a male in a black car" who "threw . . . both his arms out the window" to flag down Officer Pickel, and did so in an excited manner.[2] (Id. at 7: 20-24, 58: 1-9.) The eyewitness's hand gestures caused Officer Pickel to think "that he was trying to flag [him] down to speak with [him]." (Id. at 8: 1-3.) Upon being confronted by the eyewitness, Officer Pickel stopped to talk to the eyewitness from his police vehicle, as the eyewitness "had his window rolled down where he had his hands out." (Id. at 8: 11-13.) Officer Pickel recalled that the eyewitness "was an older black gentleman" with "a salt-and-pepper beard" who was wearing "a black peacoat type jacket." (Id. at 8: 15-17.) As to his conversation with the eyewitness, Officer Pickel testified as follows:

> He told me – so he pointed and told me that – there was a male that was walking on the bridge, which was the east side of the bridge. He was the only pedestrian on the bridge. And he told me that that male, who was wearing a black jacket with his hood up, blue jeans, and black sneakers, pulled a gun out of his, out of like – like, off his person and fired it twice into the old factory building which is across the street on the west side.

(Id. at 8: 19-25, 9: 1.) Officer Pickel further testified that he confirmed with the eyewitness that he was referring to the individual walking on the bridge, and that the eyewitness was "adamant" that this individual had "fired two rounds" into the building. (Id. at 42: 11-17.) Officer Pickel subsequently identified the man to whom the eyewitness was referring as Defendant. (Id. at 9: 17-18.)

---

[2] The Court refers to this man as "the eyewitness" herein.

Officer Pickel then "radioed to county control" for assistance, knowing that at that time of the day, there were not "as many people out in the street that would be able to help right away, so [he] got on the radio to get more units to get [police officers] out of the station to come assist." (Id. at 9: 21, 10: 2-5.) At this point, Officer Pickel began to follow Defendant – who was walking – from his patrol vehicle. (Id. at 10: 6-7.) Officer Pickel testified that before he began to follow Defendant, he did not ascertain the eyewitness's name or the license plate number of the vehicle the eyewitness was driving. (Id. at 10: 9-15.)[3] Observing that for the duration of his conversation with the eyewitness, Defendant continued to walk "to the other side of the bridge and then Stone Avenue" (id. at 10: 18-20), Officer Pickel stated that "based on [his] training and experience, if you allow people to get too far away . . . [Defendant] could have gotten down breezeways [and] cut back through the little cuts that are all over the city where it would have been difficult to locate him if he did start to run away or cut down through one of those other . . . areas" (id. at 10: 25, 11: 1-6). Based on the information conveyed to him by the eyewitness, Officer Pickel viewed Defendant as potentially dangerous and "felt that was imperative to make sure that [the police] figured out what was going on and make sure nobody got hurt." (Id. at 11: 9-15.)[4] Officer Pickel further noted that "because [he] was the only officer in the immediate area at that time, [he] felt it most important to make sure" that he "kept [his] eyes on [Defendant] instead of going immediately over [to the building], because if [he] would have gotten out of the patrol vehicle to look for shell casings or damage, then [Defendant] would have been long gone by then." (Id. at 12: 22-25, 13: 1-2.)

---

[3] Officer Pickel also testified that he did not ask the eyewitness for his address or phone number. (Id. at 28: 16-19.)

[4] Officer Pickel testified that he believed his conversation with the eyewitness had been recorded through his police body camera located on his chest. (Id. at 11: 16-24, 12: 1-16.) As discussed during the suppression hearing, however, the conversation with the eyewitness was not captured by Officer Pickel's recording device. (Id. at 28: 9-11.)

While being followed by Officer Pickel, Defendant continued walking at a casual pace and proceeded "north on the east side of South Penn Street." (Id. at 15: 23-25.) Officer Pickel continued to follow Defendant in his patrol vehicle while he informed other police units of his and Defendant's respective locations and waited until more units were "in the area to attempt to stop [Defendant] and see what was going on." (Id. at 15: 1-4.) Officer Pickel waited for assistance from additional units due to the report that Defendant "fired a firearm into a building" and that, in light of such information, it was possible that "there would have been somebody near the building" at risk of being shot. (Id. at 15: 8-13.) Officer Pickel also stated that based on such possibilities, "it was for the sake of officer safety and the safety of others around in the area" to ensure that "enough units [were] available to basically surround the subject and make sure that everything . . . was contained." (Id. at 15: 19-23.) As he followed Defendant, Officer Pickel noted that Defendant had seen him.[5] (Id. at 16: 5-8, 18-25.) In addition, the eyewitness subsequently "drove up next to" Officer Pickel, whose driver's side window was up, and appeared to mouth something to Officer Pickel, who "wasn't sure what it was" that was being communicated. (Id. at 17: 5-12.) At this time, Officer Pickel "was trying to stay focused on where [Defendant] was and what he was going, so [he] motioned for . . . [the eyewitness] to continue [driving] . . . because if something were to happen, [he] didn't want [the eyewitness] to be caught in the middle of it." (Id. at 17: 13-17.) Officer Pickel thought that he would have been able to speak with the eyewitness later, as he "actually expected [the eyewitness] to stay back at the intersection of King's Mill and Penn Street, where he was on Penn Street" and, therefore, Officer Pickel "was actually surprised to see him roll up right next to [him] while [he] was on

---

[5] Officer Pickel noted that after his patrol vehicle's brakes squeaked, Defendant turned around and observed him, and that "to be truthful, [he] thought the gig was up there, but [Defendant] just maintained walking." (Id. at 16: 3-8.)

4

South Penn Street[,]" noting that he "motioned [for the eyewitness] to continue, because [he] didn't want him to be right in the middle of the incident." (Id. at 23: 23-25, 24: 1-3.) The dash camera in Officer Pickel's patrol vehicle then began recording.[6] (Id. at 17: 18-22.)

As Officer Pickel approached South Penn Street from Princess Street and arrived at the edge of the intersection, he "activated [his] emergency lights, which automatically activates the in-car camera." (Id. at 18: 10-12.) Officer Pickel then decided to stop Defendant after "hear[ing] officers tell [him] that they were coming around the corner . . . onto Penn Street"; observing "two units coming around the corner"; and knowing that another officer "was coming down Princess Street and was about one block off." (Id. at 18: 23-25, 19: 1-2.) At this point, Officer Pickel could see that Defendant "was approaching the edge of the intersection" and because there were "three units in the back and one in the front" and "believ[ing] there might have been a second one coming from Princess Street, as well, [he] believed . . . [there were] enough units in the area to handle the situation." (Id. at 19: 3-8.)[7] Upon exiting his vehicle, Officer Pickel drew his service weapon and ordered Defendant to the ground (id. at 19: 17-22), testifying that he drew his service weapon and instructed Defendant to get on the ground "[b]ecause at that point [he] knew, or at least [he] thought [he] knew, based on the information given to [him], that [Defendant] had a firearm and that he discharged it" (id. at 19: 25, 20: 1-2). Not knowing "what [Defendant's] plan was to do upon police arriving on scene[,]" Officer Pickel "thought that the best course of action for officer safety and those around [him] was to draw [his] firearm and match the potential force that [he] would face." (Id. at 20: 5-9.)

---

[6] The video footage captured by Officer Pickel's dash camera was played during the suppression hearing. (Id. at 18: 5.)

[7] Officer Pickel testified that he did not lose sight of Defendant for the duration of these events. (Id. at 19: 13-16.)

5

Two additional police officers – Officer Hatterer and Officer Hooper – assisted Officer Pickel in his encounter with Defendant at the intersection. (Id. at 21: 20-25, 22: 1-6.) Officer Pickel testified that Officer Hatterer appeared to approach Defendant and "put his knee down onto [Defendant's] back" (id. at 21: 24-25) before placing Defendant in handcuffs (id. at 22: 1-2). A firearm was then recovered from Defendant's person. (Id. at 22: 7-9.) Officer Pickel stated that he was unsure which officer recovered the firearm from Defendant, but he knew that after a verbal exchange between Defendant and the police, Defendant "was placed in handcuffs and a firearm was recovered from his person." (Id. at 22: 12-16.) The firearm was loaded, with one round in the chamber and seven located in the magazine. (Id. at 22: 17-21.) After the firearm was recovered, it "was cleared and made safe by Officer Hooper, who . . . then gave [it] to [Officer Pickel] in a manila envelope." (Id. at 22: 17-25.) Defendant was then placed in the back of Officer Pickel's patrol vehicle. (Id. at 22: 25, 23: 1.) Further, after providing Defendant with Miranda warnings, Officer Pickel asked Defendant whether "he had a license to carry a firearm," and Defendant replied that he did not. (Id. at 23: 5-6.) Defendant also informed Officer Pickel that he possessed the firearm for protection. (Id. at 23: 6-7.) Officer Pickel's review of county records subsequently revealed that the firearm had been reported stolen. (Id. at 23: 9-18.)

B. **Procedural Background**

On July 19, 2018, a federal grand jury returned a single-count indictment charging Defendant with possession of a firearm by a previously-convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. No. 1.) Following the return of the indictment, an arrest warrant was issued as to Defendant on December 13, 2017 (Doc. No. 4), and Defendant entered a plea of not guilty as to the aforementioned charge on December 19, 2017 (Doc. No. 12). On April 9,

2018, Defendant filed a motion to suppress evidence under the Fourth Amendment to the United States Constitution. (Doc. No. 22.) The Court held a suppression hearing on July 19, 2018. Defendant submitted a brief in support of his motion prior to the hearing. (Doc. No. 23.) Following the hearing, the Government filed a brief in opposition on July 31, 2018 (Doc. No. 46), to which Defendant filed a brief in reply on August 14, 2018 (Doc. No. 47). Having been fully briefed, Defendant's motion is ripe for disposition.

## II. LEGAL STANDARD

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. See U.S. CONST. amend. IV (articulating "[t]he right of the people to be secure . . . against unreasonable searches and seizures"). "A 'seizure' occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" United States v. Wrensford, 866 F.3d 76, 85 (3d Cir. 2017) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)). "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356-57 (1967)). "On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)).

"Under the exception to the warrant requirement established in Terry, however, 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" United States v.

7

Torres, 534 F.3d 207, 210 (3d Cir. 2008) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). "Any evidence obtained pursuant to an investigatory stop (also known as a 'Terry stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)). Although a "Terry" stop requires only reasonable suspicion, a de facto arrest must be supported by probable cause. See United States v. Johnson, 592 F.3d 442, 447-48 (3d Cir. 2010) (citing United States v. Sharpe, 470 U.S. 675, 685 (1985)).

In determining whether a law enforcement officer has acted with reasonable suspicion, "due weight must be given, not to his inchoate or unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." See Terry v. Ohio, 392 U.S. 1, 27 (1968). "Reasonable suspicion is more than 'a mere hunch . . . [but] considerably less than . . . a preponderance of the evidence, and obviously less than . . . probable cause." United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018) (alteration in original) (quoting Navarette v. California, 572 U.S. 393, 397 (2014)). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990). Like probable cause, reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability[,]" and "[b]oth factors – quantity and quality – are considered in the 'totality of the circumstances' – the whole picture.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

8

Pursuant to Terry v. Ohio and its progeny, law enforcement officers may "briefly detain an individual based upon 'articulable suspicion' and then [] perform a limited protective 'patdown' for weapons during that detention 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" See United States v. Navedo, 694 F.3d 463, 467 (3d Cir. 2012) (quoting Terry, 392 U.S. at 30). Courts have acknowledged that "[i]n certain circumstances, it can be difficult to distinguish between a Terry stop, which requires only reasonable suspicion, and a de facto arrest, which must be supported by probable cause." See United States v. Johnson, 592 F.3d 442, 447-48 (3d Cir. 2010) (citing United States v. Sharpe, 470 U.S. 675, 685 (1985)); see also Gresh v. County, Civil Action No. 1:15-cv-1466, 2016 WL 1162320, at *4 (M.D. Pa. Mar. 24, 2016) ("The line between a Terry stop and a de facto arrest may be difficult to discern.").

The United States Court of Appeals for the Third Circuit has recognized, however, that "the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." See id. at 448 (quoting United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995)). Additionally, "[n]or does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid Terry stop into a full-blown arrest." Id. (citing Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995)). In determining whether an encounter is a Terry stop or a de facto arrest, "[t]he 'reasonableness of the intrusion is the touchstone' of the inquiry, in that 'the need of law enforcement officials' must be balanced against 'the burden on the affected citizens.'" See Gresh, 2016 WL 1162320, at *4 (quoting Baker, 50 F.3d at 1192). Indeed, "the Supreme Court recognized that 'it would be unreasonable to require that police

9

officers take unnecessary risks in the performance of their duties.'" See Johnson, 592 F.3d at 448 (quoting Terry, 392 U.S. at 24).

"[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). As noted by the United States Court of Appeals for the Third Circuit, the applicable standard is:

> whether, at the moment the arrest was made, the officers had probable cause to make it – whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.

United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). Although "this standard 'requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Id. (citing Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995)). Further, probable cause may exist "even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." Id. (citing Gates, 462 U.S. at 243 n.13).

In the context of tips provided to law enforcement, courts examine specific considerations in determining whether such tips may give rise to reasonable suspicion or probable cause. In Alabama v. White, the Supreme Court examined the sufficiency of an anonymous tip with respect to both reasonable suspicion and probable cause and, in doing so, "stressed two factors: (1) an officer's ability to corroborate significant aspects of the tip, and (2) the tip's ability to predict future events." See United States v. Roberson, 90 F.3d 75, 77 (3d Cir. 1996) (explaining the reasoning articulated in White as it relates to the sufficiency of anonymous tips). "[I]f a tip has a relatively low degree of reliability, more information will be required [to render the encounter constitutional] than would be required if the tip were more

10

reliable." Alabama v. White, 496 U.S. at 330. In assessing the reliability of a tip, courts look to certain factors, including whether:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation[;]
>
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated[;]
>
> (3) The content of the tip is not information that would be available to any observer[;]
>
> (4) The person providing the information has recently witnessed the alleged criminal activity [and]
>
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility[.]

United States v. Torres, 534 F.3d at 211 (quoting United States v. Brown, 448 F.3d at 249-50). Additionally, "[o]ther factors can bolster what would otherwise be an insufficient tip, such as '[the p]resence of a suspect in a high crime area . . . [a] suspect's presence on a street at a late hours . . . [a] suspect's nervous, evasive behavior, or flight from police, [and] a suspect's behavior 'that conforms to police officers' specialized knowledge of criminal activity.'" See id. (second, third, and fourth alterations in original) (quoting Brown, 448 F.3d at 251).

### III. DISCUSSION

Defendant argues that any evidence obtained from his encounter with police should be suppressed because he was subjected to a warrantless arrest unsupported by probable cause. (Doc. No. 23 at 2.) Accordingly, the Court first addresses the issue of whether the encounter between Defendant and law enforcement constituted an investigatory stop, or rather, a de facto arrest, before turning to the question of whether the encounter violated the Fourth Amendment.

   A.   **Arguments of the Parties**

### 1. Defendant's Arguments in Favor of Suppression

Defendant argues that suppression of physical evidence is warranted because he was "seized and arrested without probable cause based upon a tip from an informant who then vanished." (Doc. No. 23 at 4.) According to Defendant, "Officer Pickel was speaking to the unknown tipster within one to two minutes of shots being allegedly fired directly in front of the unknown tipster[,]" although Officer Pickel did not hear any shots being fired, smell any gunpowder, or "conduct any investigation prior to putting [Defendant] on the ground and arresting him." (Doc. No. 47 at 3.) Defendant also argues that "minimal investigation would have shown that there was no evidence that any gun had been fired other than the 'tip'" (id. at 5), and that "[t]he tip did not provide any predictive information" but, rather, "was basically anonymous and uncorroborated" (id.). Defendant argues that, therefore, "[t]here was no investigation or circumstance to support a finding of probable or reasonable cause." (Id. at 8.)

Further, Defendant contends that "[t]he Supreme Court has explained that an arrest occurs when officers either apply physical force or when a person submits to the assertion of authority" and that "[b]oth of these criteria were met when [the officers involved] ordered [Defendant] to the ground and he complied." (Id. at 10-11) (citing California v. Hodari D., 499 U.S. 621, 624-25 (1991)). To that end, Defendant states that "[u]nder no circumstances is being splayed out, face down in the middle of the street, with an officer on your lower back, a 'casual encounter' or an investigative Terry stop."[8] (Id. at 11.) Defendant thus argues that the relevant facts are more appropriately characterized as an arrest based on an "uncorroborated anonymous tip." (Id.)

---

[8] In addition, Defendant asserts that "[e]ven without a knee in the back, [the encounter involving Defendant] is an arrest because no one would feel free to leave" and, therefore, "[t]he seizure was more than a brief investigatory stop as defined by Terry." (Doc. No. 47 at 11.)

## 2. The Government's Arguments Against Suppression

The Government argues that suppression of evidence is improper because: (1) "[t]he initial seizure of [Defendant] was an investigatory stop and not an arrest"; and (2) "[r]easonable suspicion supported the investigatory stop." (Doc. No. 46 at 12, 16.) In support of the former argument, the Government states that "[a]lthough [Defendant] was certainly under arrest at the point when he was placed in the back of Officer Pickel's vehicle (which was after the firearm was recovered from his person), his initial encounter with police . . . was an investigatory stop." (Id. at 13.) According to the Government, "[b]y that point in time, [Defendant] had been directed to go to the ground and Officer Pickel had his service weapon drawn" and "[n]either fact transformed the encounter into an arrest." (Id. at 13.) The Government maintains that under relevant precedent, the officers' actions with respect to Defendant were not so invasive as to amount to an arrest, noting that "Officer Hatterer . . . did not apply handcuffs until after [Defendant] stated that he had a gun, which corroborated the eyewitness's account and justified an arrest." (Id. at 14.) Additionally, noting that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties" (id. at 15) (citing Terry, 392 U.S. at 23), the Government states that "the officers' actions were necessary for the safety of themselves and possible bystanders[,]" in light of "the eyewitness's account that [Defendant] was armed and had discharged his weapon"; Defendant's presence "in a high-crime area as trick-or-treating was about to begin;" and the location of several businesses nearby. (Id.)

As to its second argument in opposition to Defendant's motion – that the investigatory stop of Defendant was supported by reasonable suspicion – the Government contends that the tip provided by the eyewitness was sufficiently reliable so as to establish reasonable suspicion, stating that "[t]he eyewitness, in a face-to-face interaction with police, provided particularized

13

information about [Defendant]" and, therefore, was not anonymous. (Id. at 17.) Further, the Government argues that "[i]t is immaterial that officers did not ultimately identify the witness[,]" for "[t]he witness's reliability was instead supported by the fact that he 'was exposed to retaliation from [Defendant] and knew that the officers could quickly confirm or disconfirm the tip; and the officers could assess [his] credibility as he spoke, knew what [he] looked like, and had some opportunity to find [him] if the tip did not pan out.'" (Id. at 18) (fourth, fifth, and sixth alterations in original) (quoting United States v. Valentine, 232 F.3d 350, 355 (3d Cir. 2000)). Further, the Government rebuffs any "suggest[ion] that Officer Pickel should have concluded that the eyewitness . . . made a split-second decision to flag down the officer and fabricate a story about [Defendant]" on the basis that "[t]he Constitution does not compel such irrationality, especially by police officers, who are charged with making rapid decisions that directly impact public safety." (Id. at 19.)

**B.     Whether the Encounter Constituted an Investigatory Stop or an Arrest**

Upon consideration of the evidence presented at the suppression hearing, the Court concludes that the officers involved performed a valid Terry stop of Defendant and, therefore, Defendant did not undergo a de facto arrest for purposes of the Fourth Amendment. As demonstrated by the video footage of Defendant's encounter with the police, Defendant was ordered to show his hands and get on the ground, and did so immediately, and was then physically restrained by police and handcuffed before the firearm was recovered, after which point he was placed in the police vehicle. This conduct does not turn the encounter into an arrest, for "[c]ourts have held that blocking a suspect's path, approaching a suspect with weapons drawn, tackling a suspect, handcuffing a suspect[,] and placing a suspect in a police car do not necessarily convert a Terry stop into an arrest." See United States v. Colon, 654 F. Supp. 2d

14

326, 333 (E.D. Pa. 2009) (citing Sharpe, 470 U.S. at 678). Moreover, the Court notes Officer Pickel's testimony that he drew his weapon and ordered Defendant to get on the ground out of a concern "for officer safety and [the safety of] those around [him]" in light of the information relayed to him about Defendant's potential possession of a firearm. (Doc. No. 44 at 20: 1-9.) Such concerns have been deemed valid for purposes of concluding that an encounter did not extend beyond a Terry stop and amount to an arrest. See, e.g., Colon, 654 F. Supp. 2d at 333 (concluding that officers' use of a taser on a defendant did not "raise [the] confrontation to an arrest" and reasoning that "[b]oth [o]fficers suspected the [d]efendant was carrying contraband and, for their own safety and the safety of others in the neighborhood, did not want to pursue the [d]efendant through dimly lit streets"); see also United States v. Goode, 309 F. App'x 651, 654 (3d Cir. 2009) (finding that officers' restraint of a defendant did not amount to an arrest where the defendant "was suspected of dealing drugs, a crime with which 'weapons and violence are frequently associated'" (quoting United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005))). Based on Officer Pickel's assessment that such detention of Defendant was necessary to ensure the safety of the police and those in the surrounding area, and noting that Defendant was suspected of shooting a firearm into a nearby building, the Court finds that the actions taken by the officers constituted "reasonable steps to ensure that the scene was secure before investigating further." See Johnson, 592 F.3d at 448. Accordingly, the Court concludes that Defendant was detained pursuant to an investigative stop, as opposed to an arrest, and, therefore, turns to an examination of whether the stop was supported by reasonable suspicion.

    **C.**    **Whether the Stop was Supported by Reasonable Suspicion**

Upon consideration of the totality of the circumstances, the Court concludes that the investigatory stop of Defendant was supported by reasonable suspicion and, consequently, did

15

not violate the Fourth Amendment. As an initial matter, although "an anonymous tip that a person has a gun, without additional corroboration, lacks the indicia of reliability needed to justify a stop under the reasonable suspicion standard . . . an anonymous tip can be the basis for reasonable suspicion if accompanied by specific indicia of reliability." See United States v. Holloway, 489 F. App'x 591, 593 (3d Cir. 2012). In the case at bar, the tip conveyed by the eyewitness to Officer Pickel bore certain indicia of reliability. First, the tip was relayed to Officer Pickel in a face-to-face interaction such that Officer Pickel "had an opportunity to appraise the [eyewitness's] credibility through observation." See Brown, 448 F.3d at 250 (quoting United States v. Nelson, 284 F.3d 472, 480 (3d Cir. 2002)). Indeed, Officer Pickel testified that the eyewitness "seemed like he wanted to talk to [him]" (Doc. No. 44 at 58: 8-9), and noted that he "was taken aback" by being flagged down by the eyewitness because such an encounter was unusual (id. at 58: 23-25). Officer Pickel also found the eyewitness's account credible after he pointed to Defendant on the bridge and confirmed with the eyewitness that he was referring to Defendant, highlighting that the eyewitness "was adamant."[9] (Id. at 9: 8-16.) Second, the tip was provided by an eyewitness who recently witnessed the alleged criminal activity, as demonstrated by Officer Pickel's account of his conversation with the eyewitness, which affords the tip greater weight for purposes of the instant analysis. See Brown, 448 F.3d at 249-50. Although the tip provided by the eyewitness may not bear all indicia of reliability recognized within the Third Circuit, "no single factor is dispositive or even necessary to render an informant's tip reliable." See Johnson, 592 F.3d at 449. Accordingly, upon consideration of the totality of the circumstances, the Court finds that the tip provided by the eyewitness to

---

[9] Officer Pickel also believed his conversation with the eyewitness had been recorded (Doc. No. 44 at 11: 16-18), which lends support to the Court's conclusion that Officer Pickel was able to ascertain the credibility of the eyewitness – who could have been subsequently identified, had the encounter actually been recorded – and that the tip was sufficiently reliable.

Officer Pickel was sufficiently reliable so as to establish reasonable suspicion supporting the investigatory stop of Defendant.[10]

Moreover, even if the tip were considered unreliable for purposes of the Fourth Amendment, there are other factors that "if observed by police," may "corroborate an otherwise insufficient tip," including, inter alia, the suspect's presence in a high-crime area. See Brown, 448 F.3d at 251 (citing Wardlow, 528 U.S. at 124). Officer Pickel testified that he considered the area at issue to be a high-crime area, and noted specifically that in the west end, the police receive reports of "incidents of shots fired regularly, especially in the evening." (Doc. No. 44 at 6: 5-6.) In addition, Officer Pickel testified that he was unable to question the eyewitness and monitor Defendant's movements simultaneously (id. at 10: 17-20), and that "based on [his] training and experience" he had concluded that it was possible for Defendant, whom he considered potentially dangerous based on the eyewitness's account, to evade law enforcement (id. at 11: 1-15).[11]

Further, the encounter occurred in the evening on Halloween, shortly before trick-or-treating was to begin. Given that the eyewitness's account involved the discharge of a dangerous weapon on a night when more members of the community were expected to be outside, it is

---

[10] Additionally, to the extent Defendant testified that on the date in question, he had taken a different path that was situated next to the bridge (Doc. No. 44 at 77: 8-16), such testimony does not bear on the Court's reasoning as to whether the stop was supported by reasonable suspicion. Even if the Court were to credit such testimony, it is undisputed that the eyewitness informed Officer Pickel that Defendant was walking on the bridge, and the appropriate inquiry is not whether Defendant had actually committed the alleged criminal conduct, but, rather, upon consideration of the totality of the circumstances, whether Officer Pickel possessed an objectively reasonable suspicion to support the stop based on the information conveyed to him by the eyewitness. See, e.g., Johnson, 592 F.3d at 449.

[11] It also bears noting that at the time Officer Pickel received the tip from the eyewitness and followed Defendant, the sun was setting (Doc. No. 44 at 57: 17-19), which weighs in favor of finding reasonable suspicion, in light of the safety risks inherent in possibly pursuing a suspect in the dark. See, e.g., Colon, 654 F. Supp. 2d at 333 (noting safety concerns presented by "pursu[ing] the [d]efendant through dimly lit streets").

possible that if Officer Pickel "had done nothing and continued on [his] way after receiving the [eyewitness's] tip, [he] would have been remiss," for the public is "entitled to be free from fear of victimization and have police investigate . . . shootings." See Valentine, 232 F.3d at 357. It follows that under these circumstances, the Court will not "second-guess" Officer Pickel's decision to pursue and ultimately stop Defendant. See id. at 355 (concluding that it would be inappropriate "to second-guess the officer's decision to pursue the suspect immediately" when the officers "knew the suspect was still in the vicinity, and had they stalled for more lengthy questioning of the informant, the armed suspect could have escaped detection"). The Court finds that in such a scenario, Officer Pickel "did not have time to ask for details without risking [Defendant's] disappearance," which lends support to the conclusion that under the totality of the circumstances, there was reasonable suspicion to stop Defendant.[12] See United States v. Robertson, 305 F.3d at 170. Lastly, the fact that the tip concerned a firearm is significant, for the Third Circuit has indicated that a tip involving guns could suffice to establish reasonable suspicion in light of the inherent interest in public safety involved in investigating such tips. See United States v. Roberson, 90 F.3d at 81 n.4. Accordingly, upon consideration of the totality of the circumstances, the Court concludes that the investigatory stop of Defendant was supported by reasonable suspicion and, consequently, did not violate the Fourth Amendment.

---

[12] In a similar vein, the Court finds that it would not have been feasible for Officer Pickel to examine the area for shell casings prior to following Defendant, as the Court finds credible Officer Pickel's testimony that Defendant was walking "further and further away" and "because [he] was the only officer in the immediate area at the time, [he] felt it most important to make sure [he] kept [his] eyes on [Defendant]." (Doc. No. 44 at 12: 22-25.)

## IV. CONCLUSION

For the reasons stated above, Defendant's motion to suppress (Doc. No. 22), will be denied. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania